OPINION
{¶ 1} This matter comes for consideration upon the record in the trial court and Appellant's brief. Appellee did not file a brief in this matter. Appellant Martin Shunk appeals the decision of the Belmont County Court of Common Pleas, Domestic Relations Division. With that decision, the trial court adopted the magistrate's decision, overruled Martin's objections and granted the motion for directed verdict filed by Appellee Robin Maskivich. The issue we must resolve is whether the trial court abused its discretion by adopting the magistrate's conclusion that Robin was not cohabitating. Martin failed to present any evidence that Robin had been giving financial support to another man. To the contrary, Robin presented evidenced that her relationship with her paramour was not much more than casual dating. Because there was competent, credible evidence that Robin was not cohabitating, the judgment of the trial court refusing to terminate Martin's spousal support is affirmed.
 Facts {¶ 2} This case originated with the dissolution of the parties' marriage. The separation agreement was incorporated into the Judgment Decree of Dissolution filed on January 10, 2000. Pursuant to the judgment, Martin was ordered to pay Robin support in the amount of $450 per month until either party dies, remarries, or Robin cohabitates.
 {¶ 3} On April 1, 2003, Martin filed a motion to terminate his spousal support claiming that Robin had been cohabitating with an unrelated male. The motion was heard before a magistrate on July 15, 2003.
 {¶ 4} At the hearing, Robin took the stand at the hearing and testified that she worked part time at Kroger's grocery store and cleans people's homes. She lives with her two adult children, Vincent and Kristin, in a home that she owns. She formerly dated Pierre Carlier off and on for about a year. She claims the relationship ended in January of 2002. She does not see him anymore and does not plan on getting back together with him.
 {¶ 5} When asked to describe the relationship, she explained that they would go to dinner, but not to the movies. They would also go for rides on his motorcycle. However, she testified, when they went out to eat, they would each pay for their own half of the bill. Similarly, they paid for their own drinks when they went to bars together.
 {¶ 6} According to Robin, Pierre would sometimes spend time at her home. On occasion he would spend the night. She further stated that he would arrive around 8:00 or 9:00 at night and would be gone by morning. When he did stay, he would sleep on the couch. She explained that, although they had a sexual relationship, they never had sexual relations in her home. She never washed his clothes and she never cooked for him. He kept no personal belongings at the residence. He shoveled her driveway and mowed the lawn a few times. He never helped with the inside chores.
 {¶ 7} Pierre was unemployed for the duration of their relationship and lived in a trailer on his dad's farm where Robin had visited on limited occasions. Robin thought that he may have done some work on his dad's farm for income but was unsure where he got his money to pay for his half when they went out together.
 {¶ 8} After this testimony, the parties' son Vincent was called to the stand. He testified that he and his sister Kristin live with his mother. He had moved out on his own a few times but was forced to move back because of money. Vincent testified that Pierre was not the reason for him moving out and he denied ever saying that he was "tired of his mother keeping Pierre."
 {¶ 9} He testified that Pierre would spend the night off and on. He further explained that Pierre would sleep on the couch and would usually be gone by the time Vincent got up to go to work in the morning. Vincent testified that he never ate with Pierre. When asked to characterize his mother and Pierre's relationship, Vincent testified: "I would have said it was more of a friendship because he helped out my mom a lot by watching my sister because my dad never called, you know, and he —"
 {¶ 10} Vincent elaborated upon Pierre watching his sister, explaining:
 {¶ 11} "Just sitting there in the evenings with her when my mom went to college and she went to school, I mean, work, and then I worked, so, I mean, my sister has social anxiety disorder, it's documented and she wouldn't even answer the door for anybody that came in at nighttime, so, I mean, she couldn't stay there by herself. She would do a lot of off the wall things there by herself and my dad was never around and no one cared to help out, so he stayed there and helped."
 {¶ 12} When asked what else Pierre did to help his mother, Vincent responded:
 {¶ 13} "I mean, he saved her money by doing stuff, fixing stuff around the house that I could have never done. I mean, if there was something wrong in the bathroom, I remember when he'd fix the plumbing or stuff like that, so, I mean, he helped her out that way by saving her a lot of money that way, I mean —"
 {¶ 14} After Vincent's testimony, Ronald Shaw, a private investigator took the stand. Shaw had been employed by Martin to investigate his ex-residence to see if a man was living there with Robin. Shaw conducted the investigation from February 28, 2003 until March 7, 2003.
 {¶ 15} On February 28, Shaw went to Robin's house where he found no vehicles in the driveway. He then went to a bar where he was told that Robin and Pierre might be, but they were not there. When he returned to Robin's house, a blue Horizon owned by Pierre was parked in the driveway. The blue Horizon was parked in the driveway again on March 1, 3, 5 and 6, 2003, late in the evening and early morning. One of Shaw's assistant's, Michelle Stevens, took the stand and testified that she also saw the car parked at Robin's house on March 2nd and March 7th.
 {¶ 16} Jackie Shunk, Martin's present wife, took the stand and testified that in February she sent a letter to Pierre in the mail using Robin's address. She paid extra for "certified mailing" and "guaranteed receipt". However, the letter was not sent by certified mail and did not need someone to sign for its receipt. Jackie testified that she repeatedly checked to see if the mail was returned to her post office box, but, according to her, it was never returned.
 {¶ 17} Finally, Martin Shunk took the stand to testify. He testified regarding a conversation he had with his son in November of 2002 at the Tiger Pub. He stated:
 {¶ 18} "Well. We was sitting there drinking a beer and I asked him, I said I heard that Pierre — that him and Pierre got into it in the driveway and he said, `yes'. I said. `I heard you moved out.' And he says, `Yea, I'm moving out.' He said he's tired of keeping the SOB. Then he turned around and he told me, he said, `I'm not mad at you, Dad, and I'm not mad at Jackie, I'm tired of being in the middle,' he said,' and I'm getting out.' That's what he told me."
 {¶ 19} After all the testimony was presented, Robin's counsel moved for a directed verdict. The magistrate took the matter under advisement but later granted the motion on July 23, 2003. Martin filed a timely objection to the magistrate's report. However, upon review of the record, the trial court adopted the magistrate's decision on September 3, 2003.
 Motion for Directed Verdict vs. Involuntary Dismissal {¶ 20} As a preliminary matter, an important procedural point must be clarified. Although the magistrate's decision was in response to Martin's motion for a directed verdict, Civ.R. 50(A) is not applicable in a bench trial. In a trial without a jury, a motion for judgment at the conclusion of the plaintiff's case is one for dismissal under Civ.R. 41(B)(2), not a motion for directed verdict under Civ.R. 50. This distinction is important because two different tests are applied. The test for a motion to dismiss in a bench trial under Civ.R. 41(B)(2) is whether plaintiff has made his case by a preponderance of the evidence.In re Hughes (June 23, 2000), 1st Dist. No. C-990346.
 {¶ 21} If a motion for directed verdict is made in a non-jury trial, it is construed as a motion for involuntary dismissal.Cheliotis v. Gould (Dec. 14, 1994), 2d Dist. No. 14471, p. 2. On review of bench trials in which the court and the parties have mistakenly treated the defendant's motion as being under Civ.R. 50(A), appellate courts have applied the correct test to the evidence. More specifically, they have determined whether the trial court's judgment was against the manifest weight of the evidence or otherwise contrary to law. This has been done whether the claimed error was the granting of the motion or the denial of it, and whether the appellate court affirmed or reversed the judgment below. Hughes citing Johnson v. McQueen (Aug. 27, 1986), 1st Dist. No. C-850742; see, also, The Commons, Inc. v.Cioffi (July 19, 1995), 1st Dist. Nos. C-940137 and C-940339.
 {¶ 22} In the present case, the magistrate conducted a hearing regarding Martin's request for reduction in spousal support based upon Robin's cohabitation. The trial court reviewed the evidence taken at the hearing and adopted the magistrate's decision that cohabitation had not taken place. Thus, we will treat Robin's motion as one for dismissal pursuant to Civ.R. 41(B)(2) and review the trial court's granting of same accordingly.
 Termination of Spousal Support — Cohabitation {¶ 23} Because they encompass the same questions of law, Martin's two assignments of error will be addressed together. Martin claims:
 {¶ 24} "The trial court abused its discretion and committed prejudicial error by overruling the Appellant's Motion to Terminate Spousal Support because the trial courts decision was against the manifest weight of the evidence."
 {¶ 25} "The trial court abused its discretion and committed prejudicial error by adopting the magistrate's decision which granted the Appellee's Motion for a Directed Verdict."
 {¶ 26} A trial court has broad discretion in determining spousal support. Moell v. Moell (1994), 98 Ohio App.3d 748,753, citing Kunkle v. Kunkle (1990), 51 Ohio St.3d 64, 67. Determining whether a living arrangement or a lifestyle constitutes "cohabitation," for spousal support purposes, is a factual question for the trial court. Id. citing Dickerson v.Dickerson (1993), 87 Ohio App.3d 848, 851.
 {¶ 27} "[T]he essential elements of `cohabitation' are (1) sharing of familial or financial responsibilities and (2) consortium. * * * Possible factors establishing shared familial or financial responsibilities might include provisions for shelter, food, clothing, utilities, and/or commingled assets. Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations." State v.Williams (1997), 79 Ohio St.3d 459, 465.
 {¶ 28} Thus, "cohabitation requires not only a relationship, sexual or otherwise, of a permanent, continuing nature, but also some sort of monetary support between the [recipient] spouse and the paramour so as to be the functional equivalent of a marriage." Barrett v. Barrett (June 10, 1996), 12th Dist. No. CA95-06-110, at 21.
 {¶ 29} Three key factors, as set forth in Moell, are used to determine whether a cohabitation clause has been triggered. "These factors are `(1) an actual living together; (2) of a sustained duration; and (3) with shared expenses with respect to financing and day-to-day incidental expenses.'" Id. at 752, quoting Dickerson at 850.
 {¶ 30} The trial court in Moell refused to terminate the spousal support award to the ex-wife despite the fact that she was living with an unrelated male to whom she was engaged and theMoell court upheld that determination. Id. at 749. The ex-wife in Moell suffered a stroke, and thereafter resumed a prior relationship with an unrelated male. Id. The unrelated male moved in with the ex-wife to assist with her daily and personal needs resulting from the stroke. Id.
 {¶ 31} The Moell court initially reviewed the rationale underlying spousal support awards and the reason for cohabitation clauses, explaining:
 {¶ 32} "[t]he purpose of a cohabitation clause is to prevent inequity in two situations involving spousal support. The first situation occurs when an ex-spouse would receive support from two sources, each of whom is either legally obligated or voluntarily undertakes the duty of total support. * * * The second situation arises when the exspouse who is receiving spousal support uses such payments to support a nonrelative member of the opposite sex. * * * Cohabitation, in the legal sense, thus implies that `some sort of monetary support is being provided by the new partner or for the new partner. Without a showing of support, merely living together is insufficient to permit termination of alimony. * * *" Id. at 751-752. (citations omitted)
 {¶ 33} The Moell court then set forth the "three principal factors" on the issue of cohabitation along with several other factors a court may use to evaluate whether cohabitation had occurred.
 {¶ 34} "[T]he court may also consider other relevant criteria, including both the behavior and the intent of the parties. Whether the parties have assumed obligations, including support, equivalent to those arising from a ceremonial marriage is a highly persuasive factor. * * * Intent to cohabit, while not conclusive, may also be an indicator of cohabitation. * * * Likewise, neither the presence nor the absence of a sexual relationship is dispositive of the issue of cohabitation. * * * Additionally, contemplation of marriage has been considered and found not to be conclusive. * * * Each case must be evaluated on its own particular set of facts to determine whether cohabitation exists." Id. at 752 (citations omitted).
 {¶ 35} Although the resolution of these cases is always very fact driven, a review of similar cases reveals that the most significant factor applied by courts is whether there is evidence of financial support. See In Cleland v. Cleland (Feb. 2, 2004), 7th Dist. No. 03 MA 8; Geitz v. Geitz (May 20, 1999), 4th Dist. No. 98 CA 833; Barclay v. Barclay (Dec. 11, 1997), 10th Dist. No. 97APF07-902; Aldridge v. Aldridge (Sept. 21, 1998), 12th Dist. No. CA97-09-025; Schuller v. Schuller (July 9, 1999) 6th Dist. No. F-99-004; Thurston v. Thurston (April 20, 2000), 10th Dist. No. 99AP-74; Schrader v. Schrader (Sept. 29, 1999), 9th Dist. No. 2899-M.
 {¶ 36} In the present case, Martin was unable to present any evidence of direct financial support on behalf of either Robin or Pierre. Although Pierre would frequently spend the night, he did not help pay the utilities or the mortgage. In fact, Pierre did not pay for any of Robin's meals and vice versa. Martin failed to put on evidence to counter this testimony. Because it has been repeatedly held that, without a showing of support, merely living together is insufficient to permit termination of alimony, it does not appear that Martin sufficiently proved his wife was cohabitating. To the contrary, it appears Robin established that she was giving no financial support to Pierre and was receiving no financial support from him.
 {¶ 37} The present case was initially decided by a magistrate. After a magistrate has heard evidence in a domestic relations matter, and "[u]pon consideration of any objections, the [trial] court may adopt, reject, or modify the magistrate's decision * * *." Civ.R. 53(E)(4)(b). The trial court has the "ultimate authority and responsibility over the [magistrate's] findings and rulings." Hartt v. Munobe (1993), 67 Ohio St.3d 3,5. As the ultimate fact finder, the trial court determines "whether the [magistrate] has properly determined the factual issues and appropriately applied the law, and, where the [magistrate] has failed to do so, the trial court must substitute its judgment for that of the [magistrate]." Inman v. Inman
(1995), 101 Ohio App.3d 115, 118.
 {¶ 38} The magistrate in this case was required to weigh the evidence and judge the credibility of the witnesses. Because it does not appear that Martin put on any evidence of actual financial support, and Robin put on competent credible evidence to the contrary, it would be difficult to say that the trial court abused its discretion by adopting the decision of the magistrate. Accordingly, Appellant's assignments of error are meritless and the judgment of the trial court is affirmed.
Waite, P.J., concurs.
Donofrio, J., concurs.