[Cite as *R. Kashmiry & Assocs., Inc. v. Ellis*, 2018-Ohio-377.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| R. KASHMIRY AND ASSOCIATES, INC. | ) | |
| | ) | |
| PLAINTIFF-APPELLANT/ | ) | |
| CROSS-APPELLEE, | ) | CASE NO. 16 MA 0126 |
| | ) | |
| V. | ) | OPINION |
| | ) | |
| MICHAEL A. ELLIS, ET AL., | ) | |
| | ) | |
| DEFENDANTS-APPELLEES/ | ) | |
| CROSS-APPELLANTS. | ) | |

CHARACTER OF PROCEEDINGS:    Civil Appeal from Court of Common Pleas of Mahoning County, Ohio Case No. 14 CV 3069

JUDGMENT:    Affirmed in Part, Reversed in Part

APPEARANCES:
For Plaintiff-Appellant    Attorney Stuart A. Strasfeld
Attorney David S. Barbee
100 East Federal St, Suite 600
Youngstown, Ohio 44503-1893

For Defendants-Appellees    Attorney Scott C. Essad
721 Boardman-Poland Rd., Suite 201
Youngstown, Ohio 44512

JUDGES:

Hon. Mary DeGenero
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated: January 26, 2018

DeGenaro, J.

{¶1} Plaintiff-appellant/cross-appellee, R. Kashmiry & Associates, Inc. (RKA) appeals the trial court's judgment awarding defendants-appellees/cross-appellants, Michael A. Ellis (Ellis) and Ellis Insurance Agency (EIA), $65,160.00 in damages. Ellis and EIA filed a cross-appeal challenging that the trial court's decision on damages was too low, challenging the decision to grant an injunction against appellees, and to allow RKA's expert to testify at trial.

{¶2} For the following reasons, the trial court's judgment regarding the underlying appeal and the valuation of the stock is reversed. As the court's decision on damages is reversed, the cross-appeal's first and second assignment of error are moot. The remainder of the judgment on cross-appeal is affirmed. The case is remanded to the trial court to review the trial record and issue a new valuation decision regarding the stock.

## Facts and Procedural History

{¶3} RKA is an Ohio corporation that markets and sells various types of medical insurance plans. Plaintiff Ray Kashmiry is RKA's majority shareholder and chief officer. Ellis was also in the business of marketing and selling various insurance plans through his business, EIA. Eventually, Ellis and Kashmiry decided to combine their businesses by having Ellis become a minority shareholder and an employee of RKA.

{¶4} This business merger was memorialized in three contracts: an Employment Agreement, a Stock Purchase Agreement, and a Shareholders' Agreement.

{¶5} The Employment Agreement made Ellis an employee of RKA beginning on April 1, 2009. In exchange, Ellis was to receive a base salary as well as commission from all sales. After the two-year period ended, Kashmiry or Ellis could elect to terminate Ellis' employment upon 60 days of prior written notice. The employment agreement also contained a non-compete clause in the event Ellis' employment with RKA was terminated. The non-compete clause provided that Ellis was to keep RKA's customer information confidential and, for two years after Ellis'

employment was terminated, not solicit RKA's clients or service RKA's customers. However, Ellis was allowed to continue to work from his original book of business if he elected to return seven shares of RKA stock after his employment was terminated.

**{¶6}** The Stock Purchase Agreement required Ellis to turn over his book of business to RKA. In exchange, Ellis was to receive seven shares of RKA stock. Ellis also acquired another 14.4 shares of stock by signing a promissory note to Kashmiry in the amount of $107,838.14, or approximately $7,500.00 per share. The $7,500.00 figure was a number both Ellis and Kashmiry agreed to. Altogether, at the time Ellis' employment with RKA ended, Ellis owned approximately 20% of all of RKA stock. The only other shareholder of RKA was Kashmiry.

**{¶7}** The Shareholders' Agreement contained two relevant provisions. First, it provided that if a "triggering event" occurred, which included Ellis' termination of employment with RKA, Ellis would be deemed to have offered all of his stock to Kashmiry and Kashmiry would have 30 days to purchase the stock. If Kashmiry did not personally purchase the stock within the 30 days, Ellis was obligated to offer the stock back to RKA and RKA was obligated to purchase Ellis' stock based on an "agreement price." The second relevant provision in the Shareholders' Agreement concerned how the agreement price was to be calculated.

**{¶8}** There were two methods for calculating the agreement price. First, all stockholders would convene and unanimously agree and evaluate the fair market value of each outstanding share of RKA stock and issue a certificate of valuation that was valid for twelve months. If this was not done, then the second method was to be used.

**{¶9}** The second method provided that upon a triggering event, which again included Ellis' termination of employment with RKA, RKA's board of directors would appoint a qualified appraiser who would determine the agreement price. This provision outlined exactly what factors the qualified appraiser was to use when determining the agreement price. Those factors included, but were not limited to: standards referenced in the Internal Revenue Service's Guide for Valuation, Revenue

Ruling 59-60, and other factors deemed appropriate by the qualified appraiser. The appraiser was required by the Shareholder's Agreement to evaluate the agreement price within 90 days of a triggering event. Additionally, this method required "giving great weight to any prior valuations of the shares of stock which have been agreed upon by the stockholders."

{¶10} On August 15, 2014, after approximately five years of Ellis' employment by RKA, Kashmiry terminated Ellis' employment. Ellis claims his employment was terminated because he refused to take a 40% reduction in compensation despite the fact that Kashmiry was continually increasing his pay and despite the fact that RKA was significantly more profitable since Ellis became an employee. Per the Stock Purchase Agreement, Ellis elected to reclaim his original book of business and therefore returned seven shares of RKA stock. With regard to the remaining 14.4 shares of stock Ellis owned, Kashmiry elected not to purchase them personally and there was no certificate of valuation issued. Therefore, RKA was to purchase the 14.4 shares of stock at the agreement price as determined by a qualified appraiser. While RKA did hire a qualified appraiser, Kelly Bianco (Bianco), she did not complete her valuation of RKA's stock within the 90 day period specified in the Shareholder's Agreement.

{¶11} Before Bianco finished her valuation, RKA filed this action against Ellis and EIA seeking injunctive relief and damages for breach of contract. The basis for RKA's claims were that Ellis was soliciting or servicing RKA's clients in violation of the non-compete agreement and that Ellis was required to sell all RKA stock to RKA. Ellis and EIA filed a counterclaim against RKA and Kashmiry, individually, alleging numerous counts. Relevant to this appeal, Ellis raised a breach of fiduciary duty claim against Kashmiry for firing Ellis without just cause. Eventually, RKA filed for a temporary restraining order to enforce the non-compete agreement which the trial court granted.

{¶12} After litigation was initiated and approximately seven months after Ellis' employment with RKA had been terminated, Bianco completed her valuation of RKA

stock. Bianco valued all RKA stock at $405,000.00. Then, Bianco factored in Ellis' 14.4 shares and that he was only a minority shareholder and valued his stock at $28,300.00, approximately $1,968.00 per share, at the time Ellis' employment with RKA ended.

**{¶13}** In response to Bianco's report, Ellis and EIA moved to exclude Bianco's report and testimony at trial on the ground that it violated the Shareholders' Agreement because it was completed beyond the 90 days required by the agreement. The trial court denied this motion and the matter proceeded to a bench trial.

**{¶14}** Following bench trial, the court disposed of all claims as follows: Ellis and EIA's claims were all dismissed, the trial court valued the stock at $7,500.00 per share which was the price at which Ellis purchased the shares, and RKA was required to pay Ellis $107,838.00 for his shares of stock minus $42,676.00 for commissions Ellis received in violation of the non-compete agreement. As a result, RKA owed Ellis and EIA $65,160.00. The trial court memorialized its rulings in a journal entry dated August 3, 2016.

**{¶15}** Kashmiry did not individually file a notice of appeal. RKA asserts two assignments of error and Ellis and EIA raise five assignments of error in the cross-appeal, all of which we will address in turn.

## Valuation of Shares

**{¶16}** As RKA's two assignments of error are interrelated we will discuss them together, and they respectively assert:

> The trial court erred in failing to uphold the provision of the Shareholders' Agreement that stated the "Agreement Price" determined by the "Qualified Appraiser" would be binding upon the parties.

> The trial court erred when it interpreted the parties' original purchase price as a "prior valuation" of fair market value.

**{¶17}** RKA argues that, pursuant to the Shareholders' Agreement, if the parties' fail to unanimously decide the value of the shares on an annual basis, the value was to be determined by a qualified evaluator appointed by RKA's board of directors: in this case, Bianco. They further argue that the trial court's decision to view the prior purchase price of RKA stock as a "valuation" was error because doing so distorts the context of Sections 9(A) and 9(B) of the Shareholders' Agreement and renders them almost meaningless.

**{¶18}** In a contract case, the primary role of the court is to ascertain and give effect to the intent of the parties. *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452 ¶ 9. The construction of written contracts presents a question of law which is reviewed de novo. *Steubenville Firefighters Union Local no. 228 v. City of Steubenville*, 7th Dist. No. 00 JE 5, 2001-Ohio-3318 citing *Long Beach Assn., Inc. v. Jones*, 82 Ohio St.3d 574, 697 N.E.2d 208 (1998).

**{¶19}** The Shareholders' Agreement defines "valuation" in Section 9(A):

At least annually, within ninety (90) days following the end of each fiscal year of the Corporation, the Stockholders shall unanimously evaluate, agree upon, and establish the fair market value of each outstanding share of Stock in the Corporation. Said valuation shall be effective for a period of twelve (12) months and a Certificate of Valuation shall be included in the corporate minutes of the Corporation.

**{¶20}** In the event the process outlined above was not followed, Section 9(B) of the Shareholders' Agreement sets forth the process to determine valuation when a triggering event occurs, such as the termination of Ellis' employment:

* * * at the time of such Triggering Event, the Board of Directors of the Corporation shall appoint a Qualified Appraiser to determine the Agreement Price of the Offered Stock, considering all of the relevant business valuation standards and related factors including, but not

limited to, those referenced in the Internal Revenue Services Guide for Valuation, Revenue Ruling 59-60, and other factors deemed appropriate by the Qualified Appraiser, and giving great weight to any prior valuations of the shares of the Stock which have been agreed upon by the Stockholders. * * * The Agreement Price shall be determined within ninety (90) days after the Triggering Event, and shall be binding upon the Corporation, the Stockholders, and their Personal Representatives.

{¶21} During Ellis' five years of employment with RKA, no certificates of valuation were issued pursuant to Section 9(A) and no binding valuation by a qualified appraiser had been issued pursuant to Section 9(B). When Ellis originally purchased RKA shares, he and Kashmiry mutually agreed on a price that Ellis would pay. While this was clearly the agreed valuation of the stock at the time of its purchase, it did not represent the final valuation of the stock at the time of the sale back to RKA pursuant to the agreement. Thus, the $7,500 figure relied upon by the trial court should not have been the sole means of setting the stock price, as it reflected the parties' valuation at the time of purchase, but was not solely representative of the value several years later.

{¶22} It was incumbent upon the trial court to look to the plain, unambiguous meaning of the terms in Section 9(B) to determine the value of Ellis' shares at the time his employment ended. In other words, to value the shares, the court should have applied the methodology agreed to by the parties when evaluating Bianco and Dixon's testimony.

{¶23} Bianco testified that she prepared a detailed valuation report that took into account many factors including the company background and history, general economic and industry conditions, financial performance of the company. Adjustments were also made for factors such as lack of control and lack of marketability. Based on these considerations, Bianco valued the stock at $1,980.00 per share. Bianco stated that she gave Ellis' purchase price of $7,500.00 per share

little to no weight.

**{¶24}** Frank Dixon is a licensed accountant who performed tax compliance and consulting work for RKA for several years, and testified on behalf of Ellis and EIA. He explained how the parties arrived at the $7,500.00 per share purchase price in 2009. Since, pursuant to the Stock Purchase Agreement, Ellis was to receive five percent of the issued and outstanding stock shares of RKA in exchange for his book of business, they had to determine the relative values of EIA and RKA. This was accomplished by applying a multiplier of 1.25 to the 2007 gross revenue commissions for both companies. Dixon stated he did not know how a multiplier of 1.25 was reached; however, using the figures from that calculation yielded a price of $7,500.00 per share.

**{¶25}** Dixon later testified that he determined the value of the RKA shares shortly after Ellis' employment was terminated in 2014 was also $7,500.00 a share; however, Dixon does not explain the rationale for this valuation.

**{¶26}** RKA relies on *Shops at Boardman Park, LLC v. Target Corp.*, 7th Dist. No. 13 MA 0188, 2016-Ohio-7283, which held that individual terms in a contract should not be defined in isolation but rather as a whole within the context of an entire agreement. Thus, RKA argues that the trial court took the phrase "any prior valuation" out of context when examining Sections 9(A) and 9(B) of the Shareholders' Agreement because those sections defined a process by which the shareholders could value RKA stock.

**{¶27}** The trial court's judgment entry notes that the parties' agreement provides that if a triggering event occurs—here, Ellis' termination—and if the parties failed to set an annual unanimous value of the stock pursuant to Section 9(A) of the Shareholders' Agreement, the stock must be valued pursuant to Section 9(B), which provides that the stock be valued by a qualified appraiser. Again, as noted by the trial court, that provision states that the appraisal should consider a number of factors, but also "giv[e] great weight to any prior valuations."

**{¶28}** The trial court declined to rely upon Bianco's expert testimony because

she failed to give great weight to the 2009 price of the stock. And while Dixon opined that the stock value at Ellis' termination matched the 2009 value, the trial court does not state it relied upon Dixon's testimony either, instead finding:

> When the parties first valued the shares of stock in 2009 an arbitrary multiplier was agreed upon. No discounts were made for minority shareholder, nor corporate control or marketability, et cetera. Therefore, the court finds that the value of said shares of stock as of August 15, 2014, were at the same value as originally agreed upon by the parties, i.e., $7,500 per share.

**{¶29}** Hence, the trial court ignored the plain language of the parties' agreement and, instead of determining that the 2009 agreed-upon valuation was one factor that should have been given more weight by the appraiser, substituted the 2009 purchase price arbitrarily as the 2014 valuation. Based upon the trial court's reasoning, it appears the trial court was attempting to reach an equitable result in this matter. "It is not the responsibility or function of [the] court to rewrite the parties' contract in order to provide for a more equitable result." *Foster Wheeler Enviresponse, Inc., v. Franklin Cty. Facilities Auth.,* 78 Ohio St.3d 353, 362, 678 N.E.2d 519 (1997).

**{¶30}** Here, the parties failed to perform an annual valuation of the stock as provided by the express, unambiguous terms of the Shareholders' Agreement, which notably also provides that the annual valuation would only be valid for 12 months. This demonstrates an expectation that the value of the shares likely would vary on an annual basis. While the original purchase price was an agreed valuation in 2009, it is not the sole determinate factor of valuation pursuant to the parties' contract.

**{¶31}** While the original purchase price may be deemed to be *a* valuation, it is only one, and five years old at that. Applying the terms of the Shareholders' Agreement, giving great weight to a five year old valuation does not equate to giving it *controlling* weight. The trial court's decision to give that figure controlling weight,

and in fact, sole weight, was erroneous and contrary to the contract terms. Accordingly, RKA's first and second assignments of error are meritorious.

## Cross-Appeal
## Damages

**{¶32}** We turn now to Ellis and EIA's cross-appeal. Their first two assignments of error are interrelated and we will address them together. They respectively assert:

Ellis was awarded $107,838 in damages, but then the trial court subtracted $42,676 from that amount. That was error because that money was never paid to Ellis, never received by him, or never realized as income or profit.

The trial court did not place a high enough value on Ellis' 20% ownership interest in R. Kashmiry & Associates, Inc. in August 2014, Ellis' shares were worth more than $107,000.

Since, for the reasons outlined above, the trial court's decision on damages is reversed, the cross-appeal's first and second assignment of error are moot, and we decline to address them. *See* App.R. 12(A)(1)(c).

## Injunctive Relief

**{¶33}** Ellis and EIA assert in their third assignment of error:

Granting the injunction was error.

**{¶34}** Ellis and EIA urge this Court to adopt a rule that non-compete agreements are invalid if an employer terminates an employee without just cause. Additionally, they argue that Ellis' employment with RKA was terminated due to failed payment negotiations which invalidates the non-compete clause.

**{¶35}** Pursuant to the various agreements between Kashmiry and Ellis, the non-compete agreement was effective for two years following Ellis' termination from RKA; i.e., it ended on August 15, 2016. The trial court only ordered the injunction to

last for the duration of the non-compete agreement which, at the time the final judgment entry was filed, was no longer than eleven days. As the injunction has been expired for over one year, this assignment of error would normally be considered moot. However, if the non-compete agreement was unenforceable as Ellis and EIA argue, then there potentially would be no need for the injunction, and RKA would have no claim against Ellis or EIA for lost commissions due to Ellis soliciting RKA's clients after Ellis' termination.

{¶36} The standard of review regarding the granting of an injunction is whether the trial court abused its discretion. *Vajarski v. Pearch*, 7th Dist. No. 04 MA 235, 2006-Ohio-5268, ¶ 9 citing *Perkins v. Quaker City*, 165 Ohio St. 120, 133 N.E.2d 595 (1956). Abuse of discretion implies that the court acted in an unreasonable, arbitrary, or unconscionable manner. *State ex rel. Sartini v. Yost*, 96 Ohio St. 3d 37, 2002-Ohio-3317, 770 N.E.2d 584.

{¶37} Ellis and EIA do not argue that the non-compete provision of the Employment Agreement was invalid on its face. Rather, they argue that, because Ellis' employment was terminated without just cause and pursuant to failed payment negotiations, the non-compete provision should not be enforced.

{¶38} Addressing the termination of Ellis' employment without just cause argument, Ellis and EIA urge this Court to adopt a Pennsylvania appellate court's decision in *Insulation Corp. of America v. Brobston*, 667 A.2d 729 (Pa.Super. 1995) holding that an employer was not entitled to contractual non-compete protections because it terminated the employee's employment for "failure to promote his employer's interests."

{¶39} In response, RKA points to this Court's decision in *Blakeman's Valley Office Equipment, Inc. v. Bierdeman*, 152 Ohio App.3d 86, 2003-Ohio-1074 786 N.E.2d 914 (7th Dist.). In *Bierdeman*, defendant-appellee Bierdeman sold his business to Copeco and became a Copeco employee. *Id.* at ¶ 3. The employment agreement contained a non-compete clause. *Id.* Eventually, Copeco sold part of its business to plaintiff-appellee Blakeman's Valley Office Equipment, Inc.

("Blakeman's"). *Id.* at ¶ 10. The original non-compete agreement was also subject to an assignment clause in the employment agreement. *Id.* On the same day Copeco sold part of its business to Blakeman's, Copeco terminated Bierdeman's employment. *Id.*

**{¶40}** The *Bierdeman* case is slightly distinguishable from the case at bar. While this Court noted that Bierdeman appeared to have been fired without just cause, the main issue in *Bierdeman* was the assignability of the non-compete agreement and not necessarily the enforceability of the non-compete agreement against an employee whose employment was terminated without just cause. *Id.* at ¶ 27-28. But the *Bierdeman* decision still applies because, as this Court pointed out, Bierdeman and Copeco both contemplated the possibility of Bierdeman's employment being terminated without cause and this Court reversed the trial court's decision not to grant an injunction. *Id.* at ¶ 27, 46.

**{¶41}** Pursuant to the Employment Agreement, Ellis was only guaranteed employment for two years. While the agreement specified reasons for Ellis' employment to be terminated, it also provided that Ellis' employment could be terminated merely upon sixty days of written notice by Kashmiry to Ellis. Hence, the parties did contemplate that Ellis could be terminated from RKA without cause. Accordingly, the non-compete agreement is valid despite the fact that Ellis was terminated without just cause or was terminated due to failed payment negotiations. Accordingly, Ellis and EIA's third assignment of error is meritless.

### Breach of Fiduciary Duty

**{¶42}** Ellis and EIA assert in their fourth assignment of error:

It was error for the trial court to dismiss the breach of fiduciary duty claim against Ray Kashmiry. Ohio law states that when a majority shareholder fires a minority shareholder without just cause, that act is a breach of fiduciary duty.

**{¶43}** The trial court dismissed Ellis' claim against Kashmiry for breach of

fiduciary duty pursuant to Civ.R. 41(B)(2). When a trial court, during a bench trial, dismisses a plaintiff's claim pursuant to Civ.R. 41(B)(2), the test is whether the plaintiff has proven his case by a preponderance of the evidence. *Shunk v. Shunk*, 7th Dist. No. 03 BE 62, 2004-Ohio-7060 ¶ 20. The trial court's decision to dismiss a plaintiff's claim during a bench trial will be affirmed so long as the decision was not against the manifest weight of the evidence. *Id.* at ¶ 21.

{¶44} Ellis and EIA argue that because RKA was a close-corporation, Kashmiry as the majority shareholder owed a heightened fiduciary duty to any minority shareholders. The only other shareholder at any relevant time was Ellis.

{¶45} Typically, a close-corporation is a corporation with a few shareholders whose corporate shares are not generally traded on the securities market. *Crosby v. Beam*, 47 Ohio St.3d 105, 548 N.E.2d 217 (1989) at paragraph one of the syllabus. In this case, there is evidence that the only shareholders of RKA stock were Kashmiry and Ellis. Also, there was no evidence that RKA stock was traded on the securities market. Therefore, RKA is a close-corporation.

{¶46} The *Crosby* decision provides some guidance on this assignment of error. The Ohio Supreme Court held that majority shareholders in a close-corporation owe minority shareholders a duty of "utmost good faith and loyalty." *Id.* at 108 citing *Donahue v. Rodd Electrotype Co. of New England, Inc.,* 328 N.E.2d 505 (Mass. 1975). Furthermore, the Ohio Supreme Court held:

> Majority or controlling shareholders breach such fiduciary duty to minority shareholders when control of the close corporation is utilized to prevent the minority from having an equal opportunity in the corporation. Control of stock in a close corporation cannot be used to give the majority benefits which are not shared by the minority.

*Id.* at 109; (internal citations omitted).

{¶47} Ellis alleged a breach of fiduciary duty claim against Kashmiry on several grounds including: failure to include Ellis in business decisions, Kashmiry

using corporate funds to pay for personal expenses, Kashmiry paying his wife $8,000 to $12,000 a year for no apparent business purpose, terminating Ellis' employment for refusal to take a reduction in compensation, and terminating Ellis without just cause.

**{¶48}** These parties agreed that Ellis would become merely an employee of RKA—not a co-owner or manager. As previously explained, the Employment Agreement only guaranteed Ellis employment for two years. It also provided that Ellis' employment could be terminated upon sixty days of written notice by either party. Moreover, the two other agreements contemplated the possibility that Ellis' employment could be terminated without just cause. Because Kashmiry complied with the terms of the Employment Agreement, the record does not demonstrate that Kashmiry breached any fiduciary duty to Ellis. Accordingly, Ellis and EIA's fourth assignment of error is meritless.

### Expert Testimony and Reports

**{¶49}** Ellis and EIA assert in their fifth and final assignment of error:

The trial court erred in allowing the plaintiff's expert to testify. It was also error to admit her report.

**{¶50}** The admission of evidence is within the discretion of the trial court and the court's decision will only be reversed upon a showing of abuse of discretion. *State ex rel. Sartini v. Yost*, 96 Ohio St. 3d 37, 2002-Ohio-3317, 770 N.E.2d 584. Abuse of discretion implies that the court acted in an unreasonable, arbitrary, or unconscionable manner. *Id.* citing *State v. Herring*, 94 Ohio St. 3d 246.

**{¶51}** Ellis and EIA argue that because the Shareholders' Agreement required Bianco's report to be completed within 90 days of Ellis' employment with RKA being terminated, it should be excluded. However, the fact that the report was late does not preclude if from being offered as evidence at trial, nor does it preclude Bianco's testimony regarding the stock's vauation. The ultimate issue in this case was the

value of Ellis' shares of RKA stock at the time his employment was terminated. Bianco's valuation was certainly relevant evidence pursuant to Evid.R. 401. Therefore, the trial court did not abuse its discretion in admitting Bianco's testimony and report. Accordingly, Ellis and EIA's fifth assignment of error is meritless.

{¶52} In sum the trial court's judgment regarding the underlying appeal and the valuation of the stock is reversed. As the trial court's decision on damages is reversed, the cross-appeal's first and second assignment of error are moot. The remainder of the judgment on cross-appeal is affirmed. The case is remanded to the trial court to review the trial record and issue a new valuation decision regarding the stock.

Donofrio, J., concurs is part, dissents in part; see concurring in part, dissenting in part opinion.

Waite, J., concurs.

Donofrio, J., concurring in part and dissenting in part.

**{¶53}** I respectfully dissent from the majority's resolution of RKA's appeal and that portion of the majority's resolution of Ellis and EIA's cross-appeal dealing with valuation. I concur with the balance of the majority's resolution of Elis and EIA's cross-appeal. I would affirm the trial court's decision regarding the valuation of the RKA stock.

**{¶54}** In a contract case, the primary role of the court is to ascertain and give effect to the intent of the parties. *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, ¶ 9.

**{¶55}** Section 9(A) of the Shareholders' Agreement provides that all of the shareholders will come to a unanimous agreement as to the price of all outstanding shares of stock and then issue a certificate of valuation for the stock that is valid for one year. If this has not been done when a triggering event occurs, such as Ellis' termination of employment, Section 9(B) sets forth the process to determine the stock's value. Section 9(B) states in relevant part:

> * * * at the time of such Triggering Event, the Board of Directors of the Corporation shall appoint a Qualified Appraiser to determine the Agreement Price of the Offered Stock, considering all of the relevant business valuation standards and related factors including, but not limited to, those referenced in the Internal Revenue Services Guide for Valuation, Revenue Ruling 59-60, and other factors deemed appropriate by the Qualified Appraiser, and giving great weight to any prior valuations of the shares of the Stock which have been agreed upon by the Stockholders. * * * The Agreement Price shall be determined within ninety (90) days after the Triggering Event, and shall be binding upon the Corporation, the Stockholders, and their Personal Representatives.

**{¶56}** The Shareholders' Agreement itself does not specifically define the term "valuation." The closest definition to the term "valuation" can be found in Section 9(A) of the shareholders' agreement. It states in relevant part:

> At least annually, within ninety (90) days following the end of each fiscal year of the Corporation, the Stockholders shall unanimously evaluate, agree upon, and establish the fair market value of each outstanding share of Stock in the Corporation. Said valuation shall be effective for a period of twelve (12) months and a Certificate of Valuation shall be included in the corporate minutes of the Corporation.

**{¶57}** When Ellis purchased the RKA stock, he and Kashmiry agreed on a price. Ellis purchased 14.4 shares for $107,838, or approximately $7,500 per share. (Tr. 184). This fits the plain meaning of the word "valuation." Prior to Ellis purchasing the stock, Kashmiry was the sole RKA shareholder. As the president and sole shareholder, Kashmiry valued RKA's stock at $7,500 per share.

**{¶58}** Despite the $7,500 valuation, Kelly Bianco, who RKA hired to appraise the stock after Ellis' termination, testified that she gave Ellis' purchase price of $7,500 per share little to no weight. (Tr. 575-577).

**{¶59}** I would find that Bianco's valuation was not binding on the parties because, per the terms of the Shareholders' Agreement, the valuation was required to be completed within 90 days of Ellis' termination from RKA. Ellis was terminated from RKA on August 14 or 15 of 2014. Bianco's report was not completed until March 19, 2015. Per the Shareholders' Agreement, Bianco's valuation was four months delinquent.

**{¶60}** Moreover, Section 9(B) specifically says "any prior valuation" should be given great weight. Given its plain meaning, the phrase "any prior valuation" would include both the process set forth in Section 9(A) and Kashmiry valuing the stock at $7,500 per share. Bianco admitted that she did not consider the prior purchase price of $7,500 per share in her valuation of RKA stock. (Tr. 575-577). While Bianco

testified that she considered the other factors listed in Section 9(B) of the Shareholders' Agreement, her testimony indicates that she gave little to no weight to Ellis' purchase price of $7,500 per share instead of the great weight the Shareholders' Agreement required her to give it. (Tr. 575-577).

**{¶61}** The trier of fact is not bound by the appraisal or valuation methodology used by any expert witness. *Conti v. Christoff*, 7th Dist. Nos. 99 CA 84, 99 CA 327, 2001-Ohio-3421 citing *Murray & Co. Marina, Inc. v. Erie Cty. Bd. of Revision*, 123 Ohio App.3d 166, 703 N.E.2d 846 (6th Dist. 1997), see also *Youngstown Sheet & Tube Co. v. Mahoning County Bd. of Revision*, 66 Ohio St.3d 398, 422 N.E.2d 846 (1981).

**{¶62}** With no certificate of valuation issued pursuant to Section 9(A) and no binding valuation issued pursuant to Section 9(B), the trial court looked to the plain meaning of the contract to determine the value of Ellis' stock at the time his employment ended.

**{¶63}** The trial court had undisputed evidence that Kashmiry sold stock to Ellis that was valued at $7,500 per share. Furthermore, Frank Dixon, a licensed accountant who performed tax compliance and consulting work for RKA, testified that the value of RKA stock shortly after Ellis' employment was terminated was approximately $7,500 a share. (Tr. 225-227).

**{¶64}** Based on the above, I would find that the trial court determined the value of the stock within the terms of the contract. Therefore, I would affirm the trial court's judgment in its entirety.